JAMES DITTO, JR., INDEPENDENT EXECUTOR OF THE
ESTATE OF JAMES DITTO, SR. v.
DITTO INVESTMENT COMPANY

No. A-6449. Decided January 22, 1958.
(309 S.W. 2d Series 219)

*Cantey, Hanger, Johnson, Scarborough & Gooch, Jack C.
Wessler, Carlisle Cravens,* all of Fort Worth, *Black & Stayton*
and *John W. Stayton,* all of Austin, for petitioners.

The Court of Civil Appeals erred in its holding that the dis-
trict court's judgment was not supported by its findings. Since

Dr. Ditto still owned an interest in the claim upon which this suit is based the trial court correctly concluded that his testimony is barred by the dead man's statute. Article 3716 Vernon's Civil Statutes; Ragsdale v. Ragsdale, 142 Texas 476, 179 S.W. 2d 291; Wisdom v. Smith, 146 Texas 420, 209 S.W. 2d 164; Moore v. Moore, 177 S.W. 2d 998, no writ. history.

*McGown, Godfrey, Logan & Decker* and *Winfred Hooper, Jr.,* all of Fort Worth, for respondent.

In response to petitioner's point cites Bennett v. Hood, 238 S.W. 2d 587; May v. Brown, 144 Texas 359, 190 S.W. 2d 715; Pugh v. Turner, 145 Texas 292, 197 S.W. 2d 822.

MR JUSTICE SMITH delivered the opinion of the Court.

Ditto Investment Company, respondent, sued James Ditto, Independent Executor of the Estate of James Ditto, Sr., on a claim for medical services allegedly rendered by Dr. H. Howard Ditto to his uncle, James Ditto, Sr., and for attorneys' fees. The claim of Dr. Ditto against the estate of his uncle is based upon an alleged oral agreement by James Ditto, Sr. that Dr. Ditto's medical bill would be paid out of Ditto, Sr.'s estate after his death. Dr. Ditto is the only living witness to the alleged agreement and it is conceded that without his testimony the agreement cannot be proved.

On December 11, 1956 the parties appeared and announced ready for trial. A jury was empaneled and sworn, and, thereafter, in the regular order of procedure, the respondent tendered Dr. Ditto as a witness. Thereupon, the petitioner requested of the court and was granted permission to examine the witness on voir dire out of the presence of the jury. The evidence elicited at this time and later on (January 21, 1957), in connection with the Bill of Exception, was, in substance, as follows:

The claim was for medical services rendered over a period of a little over five years; that James Ditto suffered from several different ailments, and that in his capacity as a physician numerous house calls, for the purpose of treating the deceased, were made; that medical treatment was given during said period of time, and that all such services were rendered pursuant to the oral agreement between James Ditto and the witness, Dr. Ditto; that, in accordance with the agreement, the witness, after the death of James Ditto, filed his claim in the sum of $19,280.00 with the independent executor of the estate. The claim was in all

respects rejected. Without qustion, the provision of Article 3716, Vernon's Annotated Civil Statutes, would have compelled a trial court to sustain an objection based on that article to the testimony of the witness had he brought the suit in his own behalf. Dr. Ditto was so advised by counsel of his choice. The witness testified that, upon advice of counsel, he transferred the entire claim as a gift to his wife, and that no consideration was paid; that no gift tax was paid and no federal gift tax return was made by Dr. Ditto; that Mrs. Ditto formed a corporation, and the expenses in the sum of $260.00. incurred in forming the corporation, Ditto Investment Company, were paid out of the joint bank account of Dr. and Mrs. Ditto; that after the corporation was formed and immediately after Dr. Ditto had assigned the claim to his wife, she, in turn, joined by her husband, without consideration, transferred the claim to the corporation. The witness also testified that he is to pay the corporation's attorneys' fees; that the corporation is represented by the same attorneys he originally consulted. At the conclusion of this evidence, the petitioner objected to its introduction before the court and jury on the ground that it was violative of Article 3716, supra. Upon the respondent's declination to offer further evidence, the trial court discharged the jury, and on January 21, 1957 entered a take-nothing judgment in favor of the petitioner. The Court of Civil Appeals has reversed the judgment of the trial court and remanded the cause to that court for a new trial. 302 S.W. 2d 692.

Preliminary to a consideration of the question involved, we direct attention to the fact that although this was a jury trial and not a trial by the court, the respondent, after the petitioner's objection had been sustained and judgment had been entered, requested the filing of findings of fact and conclusions of law. The court, in response to such request, filed findings and conclusions and no objections to these findings of fact were made by the respondent. The filing of such findings and conclusions was neither necessary nor proper. There is no authority for the filing of findings of fact and conclusions of law under the circumstances we have here. See Rule 296, Texas Rules of Civil Procedure; Cox et al. v. Rhodes et al., Texas Civ. App., 233 S.W. 2d 924, no writ history.

The sole question on this appeal is whether or not the evidence affords a rational basis for the inference that the transfers of the claim as above outlined did not divest Dr. Ditto of his beneficial interest in the claim. In other words, did the evidence show that Dr. Ditto's testimony was barred by Article 3716,

supra. The question of the competency of the witness was one for the trial court to determine, and when objection is made, as it was here, it is proper for the court to hear the objection and the evidence and enter its ruling thereon. We are of the opinion from all the facts and circumstances in evidence that the trial court did not abuse his discretion in sustaining the objection to the evidence. Therefore, the excluded testimony was inadmissible, and the take-nothing judgment was proper. See Ragsdale v. Ragsdale, 142 Texas 476, 179 S.W. 2d 291; O'Brien v. First State Bank & Trust Co. of Taylor, Texas Civ. App., 241 S.W. 556, wr. dism.

The judgment of the Court of Civil Appeals is reversed and that of the trial court affirmed.

Opinion delivered January 22, 1958.

MR. JUSTICE NORVELL, concurring.

I concur in the opinion and order reversing the Court of Civil Appeals and affirming that of the trial court. The bar of the dead man's statute relates only to "parties." However that term as used in Article 3716, Vernon's Ann. Civ. Stat., includes one who at the time of trial has a real ownership or beneficial interest in the claim or property which is the subject matter of the litigation. When Dr. Ditto offered to testify as to transactions with his deceased uncle the judge was required to pass upon his competency as a witness. This inquiry resolves itself into a simple question of fact, namely, did Dr. Ditto, at the time he offered his testimony, possess a beneficial interest in the claim asserted by Ditto Investment Company against the estate of James Ditto, Sr., deceased? Although this question is one of fact it relates to the qualification or competency of a witness and hence, in civil cases, the decision lies within the province of the Court. McCormick & Ray, Texas Law of Evidence, Sections 2 and 256.

The trial judge has held that Dr. Ditto was an incompetent witness which necessarily includes the finding that at the time of the trial he had a beneficial interest in the claim asserted against the estate of James Ditto, Sr., deceased. This holding does not constitute an abuse of discretion in view of the record, but is supported by the circumstance that Dr. Ditto was the original holder of the claim and had transferred it to another person prior to the time he offered to testify.

The dead man's statute has been vigorouly attacked both by those who think its exclusionary effect is too limited in that it does not proscribe the testimony of all those who at any time may have had an interest in the disputed claim and by those who seriously question the wisdom of any exclusionary rule based upon pecuniary interest. There is likewise a compromise view that the evidence of holders of claims against a decedent should be received under the safeguard of a precautionary instruction. All these matters are discussed in Texas Law of Evidence by McCormick & Ray, (2d Ed.) Section 337, which sets out a proposed statutory modification of Article 3716. See also Wigmore on Evidence (3rd Ed.) Section 578. However that may be, the statute as written and as it has been construed by this Court in the leading case of Ragsdale v. Ragsdale, 142 Texas 476, 179 S.W. 2d 291, presents this ABC situation. If A has a claim against B and the circumstances giving rise to the claim are known only to A and B; A, upon B's death, holds a claim which is worthless in his hands because he cannot establish the same in court. However, such claim would have value in the hands of C, an assignee, who could use A's testimony to establish the claim, providing, of course, A assigns the claim to C *and retains no interest therein.*

An assignment thus made should receive careful scrutiny. The circumstances in themselves suggest the possibility or even probability that as between A and C, A may retain a secret beneficial interest. Our trial judges should not be required to accept these transactions at their face value but should be allowed to pass upon the credibility of the witness who asserts he has no further interest in the claim.

Insofar as this Court is concerned, the circumstance that the original transfer was made to the wife has little or no significance, regardless of what weight it might be given by the authority charged with the responsibility of determining the credibility of witnesses. Certainly there is no moral issue raised by the assignment of a just debt to "avoid" the rather arbitrary bar of the statute. I think my brother Garwood has made this abundantly clear. A debt does not become an unjust claim upon the death of the debtor. The statute, however, undoubtedly has as its objective the protection of decedents' estates from false and unfounded claims, and the fact that the exclusionary operation of the statute may be predicated upon the perhaps unsatisfactory basis of pecuniary interest will not justify its judicial repeal.

Under various factual situations it is the policy of the law to require the proponents of a proposition to carry conviction to the trier of facts with his evidence and the mere production thereof, although undisputed, is insuffiicient for this purpose. In cases involving fiduciaries, the courts place the burden upon the trustee to establish the bona fides of a transaction with the beneficiary. McCormick & Ray, Texas Law of Evidence (2d Ed.) Section 87. Undisputed testimony from an interested witness may be cited as a further example. 41B, Texas Jur. 229, Trial, Civil Cases, Section 193. In Sigmond Rothchild Co. v. Moore, Texas Com. App., 37 S.W. 2d 121, holding approved by the Supreme Court, it appeared that certain personal property had been sold as the property of F. E. Anderson upon the foreclosure of an attachment lien. B. R. Moore claimed that the property belonged to him at the time of the attachment levy and the sale thereunder. Upon the trial of this issue of ownership between Moore and Sigmond Rothchild Co. both Moore and Anderson were held to come within the rule which permits the trier of facts to reject undisputed testimony, although Anderson was asserting that he had no interest in the property.

In Ragsdale v. Ragsdale, supra, it was held that if the transaction, that is, the assignment be "a simulated one for the purpose of circumventing the statute, thus ostensibly qualifying an otherwise incompetent witness" the bar of the statute remains. We are here confronted with a situation in which simulation is easy of accomplishment. Only two persons know if the assignment of claim involved herein is real or simulated. One of these was Dr. Ditto, the other his wife, who is admittedly "interested" in the outcome of this suit. In my opinion it was incumbent upon Dr. Ditto to satisfy the trial judge that he no longer possessed an interest in the claim against his deceased uncle's estate before he should be permitted to testify as to the transactions with the decedent upon which the claim was based. Having failed to discharge this burden of persuasion, his evidence was properly rejected. I accordingly concur in the judgment reversing the Court of Civil Appeals and affirming that of the trial court.

Opinion delivered January 22, 1958.

MR. JUSTICE GARWOOD, dissenting.

One must, indeed, agree with the opinion of the Court to the extent that it defines the issue in terms other than that of a formal trial. Obviously we can't have full fledged trials over the

qualification of a witness. But conceding this much, and also acknowledging some perhaps unjudicial prejudice against the size of the $19,000 medical bill in question, I yet feel rather strongly that it was reversible error to hold that Dr. Ditto's assignment of the claim to his wife and her assignment of it to the corporation were all a pure fake.

What our decision really amounts to, in my opinion, is that where a husband makes an otherwise perfectly normal and proper gift of community property to the wife, there is a persisting presumption of fictitiousness in the transaction, if the occasion for the gift be a desire to avoid the Dead Man Statute, although such an object is admittedly no ground for raising legal, moral or conventional eye brows and, under Ragsdale v. Ragsdale, which we cite, is clearly not itself evidence that the transfer was intended to be without legal effect.

Just to point this up a bit before discussing the few items of alleged evidence of fictitiousness aside from the mere occasion for the gift, let us imagine that this suit, instead of being tried, were settled by payment to the wife of $1000, with which sum she promptly acquires an oil royalty that soon turns out to be very valuable. Let us further suppose that the husband and wife meanwhile fall out, and the husband purports to deed the royalty to X, a third person. X pays value and has no information at the time about the gift to the wife or its motive, but later learns all about it and sues the wife for the royalty on the theory that the gift was just a fake transaction to avoid the Dead Man Statute in the earlier suit. Would we, in such a situation, look at the "evidence" of fictitiousness in quite the same way in which we now view it? I beg to doubt that we would. Although the Dead Man Statute would, of course, be less directly involved than in the instant case, yet if the motive of getting around that statute is any indication of fictitiousness, it would necessarily have the same effect in the one case as in the other.

It is one thing to say that a gift to one's wife is in fraud of creditors, that is, a transaction which the law says is genuine but will be set aside at the creditor's instance. It is as a much more extreme thing to say that an otherwise legal and not unusual transaction, done in due form and at the admittedly proper suggestion of honorable counsel, was actually intended to have no effect at all except to deceive and mislead the judge in whose court this suit was brought. If it was simulated, pretended, false, fictitious or fake, then necessarily it was intended

to "evade" rather than "avoid" the law—a distinction, which, in the realm of federal taxation, means the difference between going to jail and being above reproach. It cannot have been "simulated" without the conscious intent of both husband and wife to deceive the court into doing what the court would otherwise not do.

Now if the husband here had made the gift to some mere acquaintance, to whom he owed no debt, one might not unnaturally suspect a secret agreement, or an expectation, that the friend would later give back its equivalent. But even in such a case—assuming it would normally support an inference of simulation, which may well be a question — if the evidence also showed (as in the instant case) that the transaction was made upon the advice of counsel that it had to be genuine if the claim was to be wotrh anything at all, the conclusion of fraudulent pretense would seem to be quite doubtful. Still less should such self-defeating fraud be inferred in the case of a gift to a wife, who, as a community partner, already owns half of the claim in question, has undoubtedly legal as well as moral claims upon the husband and might reasonably be expected to use the proceeds for their mutual benefit. Husbands frequently make sustantial gifts of community property to wives even without ulterior motives. The presence of such a motive actually strengthens the normal assumption that he who purports to give actually intends to give. It does not tend to prove that what is purported is ont at all intended. Where the husband purports, in the clearest way competent counsel can write, to make such a gift, and knows the donated property to be of no value to anyone unless the gift be genuine, we can hardly presume that he intended only a fraud on the court just because he would otherwise have parted finally with his community half interest in the property.

And what of the intent of the donee wife? A "simulated" bilateral transaction would seem to require that both parties to it "simulate;" and since the result of a genuine gift is all to the wife's advantage, we certainly cannot presume that *she* simulated. Of course, like her husband, she wants to avoid the Dead Man Statute, but, unlike him, she has nothing to lose, but all to gain, by the gift being genuine. The husband might conceivably have the simulation outlook or motive—composed of his selfish desire to retain ownership of his half of the claim and a conflicting desire to be able to testify to the facts sustaining the claim. But the donee wife has no such outlook because, if the gift be honest, she will get not only the benefit of the husband being able to testify and perhaps sustain the claim, but also the

full ownership of the proceeds, if it is sustained. So, at least from her standpoint, we have every reason to presume that the gift was, indeed, the genuine gift it purported to be.

But we say that there is evidence of simulation over and above the bare fact present in the Ragsdale case, that there was a family gift motivated by a desire to avoid the Dead Man Statute. This evidence is said to consist of (1) the husband's failure to pay a federal gift tax or make a gift tax return; (2) the fact that the two or three hundred dollars that went for the nominal capital stock and organization expenses of the Ditto Investment Company was purportedly a gift to the wife through a check drawn by the husband on the community (and joint) bank account; and (3) the further fact that the husband agreed to pay the attorneys in the instant litigation a fee of some $6000.

I do not presume to know for certain whether in a case of this sort we are to judge the correctness of the trial court's action by the standard whereby we test a jury verdict for "no evidence" or that whereby the Courts of Civil Appeals test verdicts attacked as "so against the great weight and preponderance of the evidence as to be manifestly wrong," or by some such standard as that both respectable and vague one called "abuse of discretion." Conceivably, since the particular problem lies in the domain of judge rather than jury, we might even handle it with our somewhat newer tool of "substantial evidence," the existence of which *vel non* we hold to be a question of law. To my way of thinking, especially since all of the facts, except the ultimate inference as to "simulative" intent, are undisputed, and there is apparently nothing that might have been importantly visible to the trial judge while less visible to us, we are justified in reversing the trial judge simply if we think differently than he did. If his ruling were one on the admissibility of evidence in the light of the Parol Evidence Rule or some other rule, we would test it, not by whether he "abused his discretion," but simply by whether he ruled differently than we would have done in his place. Why should it be otherwise just because an inference of fact is involved—once we concede the decision to be one exclusively for judges. Especially where the ruling in question disposes of the case as fully as if the claim in suit were held barred by the statute of frauds or limitations, I think we should concede no more latitude to the trial judge than we do in the matter of any error of law. But even if I am wrong about this, and if the ruling must be tested by the standards of "no evidence" or "abuse of discretion," I still think we should reverse it.

As regards the gift tax, our opinion appears simply to assume that Dr. Ditto violated the federal revenue laws. If he did not violate the law—and I greatly doubt if he did—then his conduct in this behalf is necessarily irrelevant; and even if he did, its relevance appears to me rather insignificant. Doubtless, if he thought of the matter at all, he reasoned like I myself would have done, to wit, that the then actual cash value of a five-year medical bill, collectible only by suit and with the Statute of Limitations as well as the Dead Man's Statute standing in its way, was quite uncertain enough under the circumstances to justify considering it as less than $6000, which, considering the wife's community half ownership, would have made even a return unnecessary. Certainly no taxpayer in his right mind would have paid the tax, or even made a return on the basis that such a claim had a present cash value or anything like the full amount sued for. The natural course for Dr. Ditto would be to await the result of the litigation and then handle the federal tax accordingly.

The matter of community payment for the organization of the little corporation seems equally insignificant. Probably if the wife herself had signed the check and made it out to the attorneys (the bank account being community and in both names) we would have said, "Think nothing of it." In any event, it was expressly made out to her as a gift just as the $19,000 claim was assigned to her as a gift. Are we saying that, while we may not presume the larger gift to be a fake, we may yet presume the smaller one to be part of a fake and therefore to prove that the larger one was a fake? Such is hardly good logic. Moreover, in this community property state, in which all the family cash is usually in the control of or handled by the breadwinner husband, is there anything even a little peculiar about the husband (or wife) signing a community check by way of an advance or contribution in benefit of the wife's separate estate? Conceivably if the check were not marked "gift" (as it was) we might say that the community had a corresponding claim against the wife's separate estate, but not that it was proof of the whole arrangement being pure sham. Such reasoning seems simply to disregard the facts of life.

The same reasoning applies to the rest of the alleged evidence in question. All of it is readily explainable by common knowledge of the way in which family financial affairs are usually handled. The family cash being usually under the breadwinner husband's immediate control, if he makes a gift of lands to his wife to be her separate property and finds the services

of a lawyer to be necessary in the premises, he naturally pays the lawyer by a check on the community bank account; and if a third party is found to be in wrongful possession of the land, naturally the husband makes arrangements for the necessary suit and in all probability pays or advances community cash for the lawyer's retainer and expenses. When he does so, we may, perhaps, assume that he intends for the wife to reimburse the community sooner or later, but we can hardly infer an intent on both his part and the wife's that the gift of the land is some sort of fraudulent pretense. Any claim that fraudulent pretense is indicated by use of the same lawyers for both this suit and the drawing of the papers for the gift would be altogether without foundation. One might as well say that where the husband and wife consult the same physician, there is evidence of fraudulent pretense.

Obviously we would not dream of calling the instant transaction a fake, but for the fact that the Dead Man Statute is involved; and even where it is involved, we would probably not regard evidence like the present as any proof of pretense, if, as in the illustration heretofore given, the right of the husband to testify were a secondary rather than primary issue. The evidence of intent to stimulate, aside from the mere motive of avoiding the statute, is no evidence at all. It therefore seems that we assume the intent in the first place, and then point to the other facts of the case as being consistent with it, and therefore corroborative of it.

Under the circumstances present in the instant case, it seems to me the same thing as presuming pretense to say that the respondent-plaintiff Ditto Corporation had the burden of convincing the judge that the transaction was not a fake and that the judge had the discretion to disregard written instruments, which ordinarily he could not disregard. It will not, indeed, always be easy for the other party in such a case to show an intent to simulate; but to hold, in this case, that the judge was free to treat the instruments as bogus, is to hold that in no case of a transfer to avoid the statute can its validity be established beyond the discretion of the judge to disregard it. What we really are doing is undoing what was decided in the Ragsdale case, while citing the latter as if it somehow acquiesced in its own destruction.

There is, of course, no Dead Man Statute decision cited for the petitioners-defendant, which places the burden of persuasion that the transaction was not a fake upon the party offering

the witness in question. The suit is one to which prima facie the witness is not a party; and should there have been a recovery on the strength of his testimony, obviously he would never be able to assert thereafter that the money recovered was really still community property or the corporate stock community property. Why, under such circumstances, should we put a burden of showing "no bad faith" on the corporation rather than on the party objecting to the witness? If the suit involved title to land once owned by the witness but purportedly sold by him to one of the litigants by duly recorded deed, we would hardly hold that, when the deed was introduced and the witness offered, the court might, without more, and in his discretion, treat the deed as a fake. And yet such a sale is not a whit more believable than—could be as easily faked as—a gift from the witness to his wife, once we concede, as we must, that the motive for the gift is, in the words of the Ragsdale case, "immaterial."

Decisions such as Sigmond Rothchild Co. v. Moore, Texas Comm. App., 37 S.W. 2d 121, in my opinion, have no bearing here. The Rothchild Co. case, which, of course, in nowise involved the Dead Man Statute or the bona fides of a transaction which admittedly occurred, proclaimed no rule that whenever a purported property transfer to the plaintiff may be such as to avoid otherwise unfavorable consequences, the trial court has the discretion to treat unimpeached evidence of such transfer as if it did not exist. In that case, Moore, as alleged owner of some flour and meal, sued the Rothchild Co. and the sheriff for conversion of the property by means of an attachment and sale in an earlier suit by Rothchild Co. against one Anderson. The evidence, as Judge Critz took pains to observe, showed not only that the property in question had been bought by Anderson in his own name, but that, at the time of the attachment, it was exposed for sale by Anderson at his place of business along with other more or less similar goods which he regularly sold in his business. The question was not at all whether (as in the instant case) a transaction, which had undoubtedly occurred prior to the attachment, was not intended to be what it purported to be, but whether any such transaction had occurred at all. It was held, and no doubt properly, that since, at the critical time of the attachment against Anderson, all of the legal indicia of ownership were in Anderson, anyone claiming in a later suit that the property was not Anderson's (as Moore claimed) had the burden of proving such, and that the evidence offered by him from Anderson and others had so many weaknesses of one kind or another that the court was not compelled to believe it.

The burden of proof statement was simply another instance of the old maxim that "possession is nine points of the law." In the instant case, at the critical time (when the testimony of Dr. Ditto was offered), all the indicia of ownership was in the Ditto Corporation as remote assignee of the owner, Mrs. Ditto. Certainly if Rotchchild Co. had levied its attachment against Dr. Ditto after all that has happened in the instant matter, it may be doubted if we would have held Ditto Corporation to have any burden of convincing the court that the assignments were not intended to be a mere sham. And, of course, no one could fairly say that the facts in the Rothchild Co. case indicating ownership not to have been in Moore at the critical time have any resemblance to the facts alleged in the instant case to indicate that the assignments were a sham.

It might, indeed, not be beyond the pale of reason to hold that even an admittedly effective gift or sale from one spouse to the other does not so remove the former from the picture as to place him or her beyond the ban of the statute. But what we actually do is to hold, and without saying so, that an otherwise perfectly normal and genuine gift is presumptively intended to have no effect except as a trick on the court. The decision will have this result: In cases of this general type, there will continue to be gifts made to avoid the statute. Some of them will "get by" and others that are identical with those which "get by" will not do so—probably according to whether the particular judge favors or does not favor the policy of the statute. While, of course, such a result is not altogether novel in the law, it is nonetheless undesirable and we should avoid it as much as we can.

I think the case should be remanded for trial, with Doctor Ditto being permitted to testify.

Opinion delivered January 22, 1958.