IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

---

No. 96-11578

---

SOUTHMARK CORP.,

Appellant,

versus

FEDERAL DEPOSIT INSURANCE CORPORATION,

Appellee.

---

Appeals from the United States District Court
for the Northern District of Texas
(3:95-CV-482-X)

---

April 20, 1998

Before GARWOOD, DUHÉ and DeMOSS, Circuit Judges.[*]

GARWOOD, Circuit Judge:

Plaintiff Harmon Envicon Associates (Harmon Envicon) brought this adversary proceeding in bankruptcy court against debtor-respondent-appellant Southmark Corporation (Southmark or Appellant) during Southmark's Chapter 11 bankruptcy, seeking a declaratory judgment that Southmark was not entitled to the proceeds of a particular note. Sometime thereafter, the Resolution Trust Corporation (RTC) succeeded to Harmon Envicon's interest, and the

---

[*] Pursuant to 5TH CIR. R. 47.5 the Court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

bankruptcy court granted summary judgment in favor of the RTC. The bankruptcy court held that Southmark had relinquished its right to receive the note proceeds when it entered into a Settlement Agreement in an unrelated suit that contained general release language. Pursuant to 28 U.S.C. § 158(a), Southmark appealed this decision to the district court, which affirmed the bankruptcy court's grant of summary judgment. While the appeal was pending before the district court, the Federal Deposit Insurance Corporation (FDIC or Appellee) succeeded to the RTC's role. Southmark now appeals to this Court, pursuant to 28 U.S.C. § 158(d). We reverse and remand.

## Facts and Proceedings Below

This is a dispute over who holds the right to receive the proceeds of a mortgage note. In May 1981, Wilkeswood Associates, Ltd. (Wilkeswood) issued its wraparound mortgage note (the Note) for $7,650,000 to Unicorn Insurance Company, Inc. (Unicorn). Wilkeswood was a New Jersey limited partnership, and executed the note through its general partner, Berg Harquel Associates, a New Jersey joint venture. Berg Harquel Associates later became named Harmon Envicon Associates (Harmon Envicon). The Note was nonrecourse and was secured by liens on an apartment complex (Wilkeswood Apartments) located in Luzerne County, Pennsylvania, and owned by Wilkeswood. The Note provided it could not be assigned or transferred without Wilkeswood's written consent so long as Wilkeswood owned the Wilkeswood Apartments. The Note itself was held at all times by the original payee, Unicorn.

2

Eventually, the property, encumbered by the Note, was sold and the 21.25% share of the Note net proceeds, belonging to either Harmon Envicon or Southmark, was placed in escrow pending a determination of the ownership of these funds.

In July 1981, effective June 30, 1981, Unicorn granted an 85% participation interest in "the Net Cash Flow" under the Note and mortgage to Pennsylvania Realty Consultants Company (PRC), a New Jersey partnership in which Harmon Envicon (then known as Berg Harquel Associates) was a 50% partner (the other 50% partner in PRC was Emil Stavriotis).[1]  Appellant and Appellee both agree that Harmon Envicon "owned" 50% of PRC and was thus entitled to 42.5% of the net cash flow from the mortgage Note.

---

[1] This was accomplished by a "Wraparound Mortgage Participation Agreement" between PRC and Unicorn, which included a recital that "the parties wish to establish the ownership of the Note and Mortgage" and provided in part as follows:

> "1.  (a) As used in this document, the term 'Net Cash Flow' shall mean the difference between (i) the payments made to the holder of the Note and Mortgage or any replacement or extension thereof and (ii) any payments required to be made by the holder of the Note and Mortgage under the terms thereof to the holders of any prior liens on the property secured thereby.
>      (b) As used in this document the term 'Net Cash Flow' shall also include any share of refinancing, or sale proceeds, prepayment premium, fire insurance or condemnation proceeds received by the holder of the Note or the New Note (as defined in subparagraph (c) hereof).
>      (c) If the note and Mortgage is sold, transferred or assigned and a note or letter obligation ('New Note') is received by the holder thereof, then the term 'Net Cash Flow' shall also mean the difference between (i) the payments made to the holder of the New Note and (ii) any payments required to be made by the holder of the New Note, pursuant to the terms of the New Note on account of any prior lien upon any property securing the New Note."

3

In June 1987, Southmark, a Georgia corporation, acquired all the shares of Southern Ventures, Inc. (SVI), a New Jersey corporation. SVI was a fifty percent co-venturer in Harmon Envicon, and thus Southmark, through SVI, obtained a fifty percent interest in Harmon Envicon. Southmark's interest, however, was subordinate to the interests of City Federal Savings Bank (City Federal) and Empire of America Savings Bank through a Subordinated Loan Participation and Purchase Agreement executed by Southmark.

In July 1989, Southmark filed under Chapter 11 in bankruptcy court in Georgia; in October 1989, the bankruptcy proceeding was transferred to the Northern District of Texas.

In late 1990, Southmark sold all its shares in SVI to Charles Loccisano and Robert T. Harmon[2] (Harmon/Loccisano), who thereby purchased all of Southmark's interest in Harmon Envicon. At this time Harmon Envicon was still a partner in PRC and was thus entitled to receive 42.5% of the Note net proceeds. However, as consideration for the sale of SVI to Harmon/Loccisano, Harmon Envicon, at approximately the same time, executed a "Partial Assignment of Interest In Proceeds From A Promissory Note" dated October 16, 1990, (the Assignment) conveying ("Assignor hereby sells, assigns and conveys to Assignee a fifty percent (50%)

---

[2] Robert T. Harmon, as general partner of Harquel Associates II, a New Jersey limited partnership that was one of the joint venturers in Berg Harquel Associates (later known as Harmon Envicon), had executed (on behalf of Berg Harquel Associates as one of the two PRC partners) the Wraparound Mortgage Participation Agreement between PRC and Unicorn (see note 1, *supra*). Robert T. Harmon also executed the December 1990 assignment from Harmon Envicon to Southmark.

interest in Assignor's Note Proceeds," defined to mean Assignor's interest in Note net cash flow) to Southmark 50% of Harmon Envicon's 42.5% interest in the Note net cash flow free of liens, interest claims, and encumbrances—giving Southmark a 21.25% interest in the Note net cash flow. This Assignment however, was expressly made subject to the superior security interests held by City Federal, and other lenders, in Harmon Envicon's partnership interest in PRC (including the interest resulting therefrom in the Note proceeds).

On July 12, 1991, Southmark filed in its bankruptcy proceeding a voidable transfer action against Harmon Envicon and several affiliated partnerships. The action was related to Southmark's initial acquisition of SVI, but did not involve either the subsequent sale of SVI to Harmon/Loccisano or the Assignment. On December 6, 1991, Southmark and Harmon Envicon entered into a Settlement Agreement and Mutual Release (the Release) in which Southmark agreed to release certain funds that it held related to various partnerships it and Harmon Envicon (and related entities) had been involved in, including Wilkeswood. The Release also contained a broad general mutual release in which the parties released one another from "any and all debts, claims, liabilities, obligations, causes of action and rights, whether known or unknown, which each party now owns or holds . . . ."

In March 1993, the Wilkeswood Apartments were sold. The purchase price was apparently sufficient to pay off all liens on the Wilkeswood Apartments, including the Note and lien securing it.

The title company held in escrow the amount allowable to the 21.25% interest covered by the October 1990 Assignment from Harmon Envicon to Southmark. Harmon Envicon then initiated the current adversary action against Southmark. In the bankruptcy court below, Harmon Envicon sought a declaratory judgment that Southmark was not entitled to any proceeds of the Wilkeswood sale since the interest in 21.25% of the Note net cash flow that Southmark received through the Assignment was later released when Southmark executed the broad Release. Southmark counterclaimed, and both parties filed motions for summary judgment.

The bankruptcy court entered summary judgment in favor of RTC, which had by then replaced Harmon Envicon as plaintiff. The bankruptcy court found that the Assignment had conveyed to Southmark a *contingent right* to payment, not an *ownership* interest in the Note net cash flow, and because the interest was a contingent right, it was released in the general Release that the parties executed in conjunction with their settlement of the voidable transfer action. Accordingly, the bankruptcy court held that Southmark had no claim to the funds from the Wilkeswood Apartments sale. On Southmark's appeal to the district court, the summary judgment was affirmed.

Southmark filed a timely notice of appeal to this Court. On this appeal, Southmark raises two issues. First, it contends that the general language of the Release could not operate to release Southmark's unrelated rights under the Assignment, and second, the Assignment passed an ownership interest of a kind which is not

6

transferred by a mere release.

**Discussion**

We review a summary judgment *de novo*, applying the same criteria employed by the lower court. Summary judgment is proper if, viewing the evidence in light most favorable to the non-movant, there is no genuine issue as to any material fact. *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 106 S.Ct. 2548, 2554 (1986). An issue is "material" if its resolution in favor of one party will affect the outcome of the lawsuit; an issue is "genuine" if a reasonable jury could return a verdict in favor of the non-movant. *See Anderson v. Liberty Lobby, Inc.*, 106 S.Ct. 2505, 2510 (1986).

I. Release

Southmark first contends that regardless of the nature of its interest in the Note proceeds that interest was unrelated to the particular controversies giving rise to the Release and hence, not being specifically mentioned, was not covered by that document's broad and general basket clause. We disagree.

Although general releases are narrowly construed, *see Duncan v. Cessna Aircraft Co.*, 665 S.W.2d 414, 422 (Tex. 1984), broadly worded general releases are enforceable as long as the claim in question is included within the wording of the release. *See, e.g., Shelton v. Exxon*, 921 F.2d 595, 602 (5th Cir. 1991); *Ingram Corp. v. J. Ray McDermott & Co., Inc.*, 698 F.2d 1295, 1310-12 (5th Cir. 1983) (all enforcing broadly worded general release); *cf. Victoria*

7

*Bank & Trust Co. v. Brady*, 811 S.W.2d 931, 938 (Tex. 1991); *Baker v. City of Fort* Worth, 210 S.W.2d 564, 567-68 (Tex. 1948); *Vela v. Pennzoil Producing Co.*, 723 S.W.2d 199, 204 (Tex. App.--San Antonio 1986, writ ref'd n.r.e.); *Houston Oilers, Inc. v. Floyd*, 518 S.W.2d 836, 838 (Tex. Civ. App.--Houston [1st Dist.] 1975, writ ref'd n.r.e.) (all holding that a certain cause of action or occurrence was outside the scope of the general release).[3]

If a releasing instrument does not "mention" the claim, and the claim is not within the subject matter of a release, it cannot be discharged by a general release. In *Victoria Bank & Trust*, 811 S.W.2d at 938, for example, the court found that a general release discharging all claims or causes of action attributed to a certain *loan transaction* did not discharge a claim related to a *cattle transaction*. Similarly, in *Vela*, 723 S.W.2d at 204, the court held that a general release related to the *validity* of an oil and gas lease did not serve to discharge a cause of action for *improperly pooling* the land in violation of the terms of the lease.

However, a general release that is not limited to a specific cause of action or occurrence, and broadly releases all claims and causes of action between two parties, is valid and enforceable. In

---

[3] The parties have largely briefed this appeal without any explicit discussion of choice of law issues, but apparently on the assumption that Texas law controls (or that the law of whatever other jurisdiction might control is not materially different). The bankruptcy court made no clear choice of law determination. The Release contains a clause stating it "shall be construed and enforced in accordance with the United States Bankruptcy Code and the laws of the State of Texas as applied to contracts made and to be performed entirely within Texas."

8

*Ingram*, 698 F.2d at 1312, this Court recognized that it must enforce a release that discharges all, known or unknown, "past, present, or future" claims. And in *White v. Grinfas*, 809 F.2d 1157, 1159 (5th Cir. 1987), this Court, applying Texas law, enforced a release in which the parties agreed to "release and forever discharge any claims or causes of action of whatsoever nature which may exist among them on account of any event, occurrence, transaction, or happening prior to the date of this Settlement Agreement and Mutual Release."

The Release at issue in this case, like the release in *White v. Grinfas*, was broad and not limited to a specific transaction or cause of action. Paragraph 7 of the Release states that the parties release one another from "any and all debts, *claims*, liabilities, obligations, causes of action and rights, *whether known or unknown, which each party now owns or holds*, or at any time heretofore owned or held, by reason of any act, matter, cause *whatsoever*." (emphasis added). Since the language of the Release is not limited to the voidable transfer action that gave rise to the dispute, we hold, as a matter of law, that this Release—executed by sophisticated businesses represented by counsel—is enforceable as written and discharges *all* debts, claims, liabilities, obligations, causes of actions, and rights (collectively: released interests). Although the language of the Release is unambiguous in this respect and, in accordance with standard rules of construction, should be construed and enforced as written, it *is* ambiguous as to whether the interest in the Note net

9

proceeds falls within one of the categories of released interests. We hold that if the Assignment, as between the parties thereto, transferred a present ownership interest, that such interest is not within the interests which the Release releases and that the Release did not retransfer that interest from Southmark back to Harmon Envicon. Obviously, "rights" as used in the Release does not embrace—and appellee does not claim that it does—*everything* Southmark then owned or, indeed, even *everything* Southmark had ever acquired from Harmon Envicon (and still owned).

II. Interest in the Note Proceeds

Southmark contends that the Assignment conveyed an *ownership* interest in the Note net proceeds, which could not have been inadvertently transferred by the Settlement Agreement. The bankruptcy court specifically held that Southmark did not obtain an ownership interest in the Note because Southmark had no right to collect payment directly from the payor of the Note. The bankruptcy court found that Southmark merely had a *claim*, and that that *claim* was released in the broad "Mutual General Release" of the Settlement Agreement. Because there are questions of fact concerning the parties' intent as to the exact nature of the interest that was conveyed by the Assignment, we reverse the bankruptcy court's grant of summary judgment and remand the case for further proceedings.

The documentary evidence is not unambiguous as to what sort of interest the parties intended to pass. The transaction was

10

labeled an assignment; under Texas law[4] an assignment passes the whole interest held by the assignor to an assignee. *See Ditto Investment Co. v. Ditto*, 302 S.W.2d 692, 694 (Tex. Civ. App.--Fort Worth 1957) *rev'd on other grounds*, 309 S.W.2d 219 (Tex. 1958). However, merely labeling a transaction as an "assignment" does not necessarily make it a true assignment. The intent of the parties is an essential element of an assignment and, at least as between them, takes precedence over the label attached to the transaction.

For instance, if the parties merely intend to pass a collateral security interest, but phrase the transaction in terms of an absolute assignment, the interest passed will be governed by their intent and will not be considered an assignment. *See, e.g., Olshan Lumber Co. v. Bullard*, 395 S.W.2d 670 (Tex. Civ. App.-- Houston [1st Dist] 1965, n.w.h.); *cf*. 7 Tex. Jur. 3d § 24 (1997)

---

[4] The Assignment was executed in Texas, and thus Texas law would ordinarily control. *See* 7 Tex. Jur. 3d *Assignments* § 5 (1997). However, the Assignment contains a provision stating: "This Assignment and the legal relations between the parties relating to the transactions described in this Assignment shall be governed by, and construed in accordance with, the laws of the State which governs the Note." We assume Pennsylvania law governs the Note, as it is a nonrecourse note stating that it is secured by the described real property in Pennsylvania. The "Wraparound Mortgage Participation Agreement" contains a clause stating: "This agreement has been negotiated and entered into in the State of New Jersey and shall be interpreted pursuant to the laws of the State of New Jersey as to all matters, except title matters as to which the law of the State of Pennsylvania shall apply."
The parties in their briefing on this appeal have not explicitly addressed these choice of law provisions or cited us to any New Jersey or Pennsylvania cases which are on point. For purposes of our disposition of this appeal, we will assume that Texas law either controls or is not materially different from either New Jersey or Pennsylvania law as to the relevant issues concerning the Assignment.

("Intent is an essential element of an assignment and, thus, not every contract involving a transfer of interests is an assignment.") (citing *Thurber Const. Co. v. Kemplin*, 81 S.W.2d 103 (Tex. Civ. App.--Austin 1935, writ dism'd)). The same is true for an equitable assignment; in order to create an equitable assignment, "the agreement must evidence an intent to transfer the interest . . . ." *Pape Equipment Co. v. I.C.S., Inc.*, 737 S.W.2d 397, 402 (Tex. App.--Houston [14th Dist.] 1987, writ ref'd n.r.e.).

In this case, the parties' intents concerning the assignment are unclear. The Assignment document in this respect is ambiguous on its face and does not reveal what type of interest the parties intended to pass.

On the one hand, the Note proceeds were assigned as consideration for the sale of SVI to Harmon/Loccisano and, prior to this dispute, all parties involved seem to have treated it as an ownership interest. But the fact that the proceeds would be filtered through Harmon Envicon, which had already pledged the Note proceeds as a security interest to City First, may suggest that the interest was intended to be something less than an ownership interest. Although Southmark was to receive the Note proceeds through Harmon Envicon, there was an unexercised provision in the Assignment whereby Southmark could have directed Harmon Envicon to direct PRC and the Note holder to pay the proceeds directly to Southmark (though there is nothing said about directions to the maker of the Note). There is no evidence of how the parties treated the Note's "Net Cash Flow"—or, indeed, if there was any

12

such—after the Release (or even after the Assignment) and prior to the sale of the Wilkeswood Apartments. There is nothing in the record to indicate whether after the Assignment and before the Release (or, indeed, before the Wilkeswood Apartments sale) there was (or was not) ever any dispute as to the validity of the Assignment, or as to what was transferred thereby, or as to whether Harmon Envicon (or anyone else) had fulfilled all its obligations thereunder. There is nothing in the record to indicate whether or not Harmon Envicon ever requested a return of the Assignment or a reassignment. The case is further complicated by the fact that the Note itself never changed hands and the original holder, Unicorn, is uninvolved in these proceedings.

Because of the inconclusive evidence concerning the intent of the parties and nature of the assignment, we hold that Appellee has not met its summary judgment burden of demonstrating there are no genuine issues of material fact as to whether Southmark had an ownership interest in the Note net proceeds. For this reason we remand the case to the bankruptcy court for further proceedings concerning the intentions of the parties to the Assignment. If it is found that the parties to the Assignment intended to pass an ownership interest, then, as between the parties, that intent will control the nature of the interest for purposes of the Release, and the Release will not extend to, or retransfer to Harmon Envicon, the interest intended to be conveyed by the Assignment.[5]

---

[5]

We note that what is at issue here is not any claim by Southmark that Harmon Envicon ever—either before or after the Release—failed

## Conclusion

We hold that, absent reformation or fraud (neither of which is urged here), the parties' intent as to the scope of an unambiguous release is irrelevant and the release should be enforced as written; however, the parties' intent as to the ambiguous instrument (the Assignment) to which the release is claimed to apply is relevant and dispositive. The case is therefore remanded so that the bankruptcy court can ascertain the intent of the parties as to whether or not the Assignment was to convey all ownership interest (legal or equitable).[6]

---

to pay Southmark any amounts that Southmark was (or claimed to be) entitled to under the Assignment. Rather, the sole question is whether the amounts currently (and apparently properly) held in escrow by the title company which are attributable to the 21.25% interest which was the subject of the Assignment are the property of Southmark or of Harmon Envicon.

We observe in passing that there might be a question whether Harmon Envicon, which was only a partner in PRC, could pass to Southmark an interest in partnership property (the 85% interest in Net Cash Flow of the Note). However, none of the parties have raised this issue on appeal, and all have assumed that the Assignment was valid and transferred to Southmark all it purports to. Moreover, even if the issue had been raised and the Assignment held invalid on that basis, nevertheless if Harmon Envicon and Southmark in the Assignment treated it as conveying an ownership interest then, absent some later dispute about that at or prior to the Release, it would appear that it should be treated as such, as between those two parties, for purposes of the Release.

[6]

The FDIC is the sole plaintiff-appellee, as it ultimately was below. The FDIC apparently has other claims to the disputed escrowed funds that do not depend on the Release. Neither the bankruptcy court nor the district court ruled on such other claims, and nothing in this opinion speaks to them. On remand, the bankruptcy court, if it finds the FDIC is entitled to such funds other than by virtue of the Release, may proceed on that basis (subject, of course, to ultimate review on appeal) rather than by determining the issue covered by our above remand.

REVERSED and REMANDED